CLERK'S OFFICE
A TRUE COPY
Jun 24, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | | | |
|---|---|---|---|---|
| United States of America | ) | | | |
| v. | ) | | | |
| Irving Alanis (DOB 04/XX/2003) | ) | Case No. | 25   MJ   114 | |
| | ) | | | |
| | ) | | | |
| | ) | | | |
| _____ | ) | | | |
| *Defendant(s)* | | | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 2025 - June 2025_____ in the county of _____Milwaukee_____ in the _____Eastern_____ District of _____Wisconsin_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 922(o); 21 U.S.C. § 841; 26 U.S.C. § 5861(a) | conspiracy; unlawful possession of a machinegun; distribution of controlled substances; unlawful dealing of NFA firearms |

This criminal complaint is based on these facts:

Please see attached Affidavit.

☑ Continued on the attached sheet.

Matthew Bammert

*Digitally signed by Matthew Bammert*
*Date: 2025.06.20 10:51:42 -05'00'*

*Complainant's signature*

Matthew Bammert, ATF SA

*Printed name and title*

Sworn to me via telephone:

Date: _____06/24/2025_____

*William E. Duffin*

*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS
## AND SEARCH WARRANT

I, Special Agent Matthew Bammert, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AFFIANT'S BACKGROUND

1. I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Milwaukee Field Office. I have been employed since December 2023. Prior to ATF I was employed as a Police Office for the United States Secret Service Uniform Division for a little over 5 years. I also have a Bachelor of Science Degree in Policial Science Pre Law from Northern Michigan University.

2. Through my law enforcement career, I have attended 4 separate training academies. For ATF I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia) and ATF's National Academy. The training included courses on constitutional law such as search and seizure, and conducting investigations through searches, arrests, interviews, surveillance, and evidence collection. The training also included firearms trafficking, drug trafficking, and firearms recognition. It covered an in depth break down of the requirements to possess, manufacture, deal, sell, and transfer National Firearms Act ("NFA") weapons and requirements for selling, dealing, and manufacturing firearms.

3. I have investigated federal firearms violations to include the trafficking, manufacturing and illegal possession of firearms, to include investigations into violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun) and multiple different violations of the National Firearms Act. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

1

4. I have participated in numerous investigations in which electronic devices, to include phones, computers and tablets, have been seized and analyzed. I have participated in investigations in which location data has been used to identify targets, map pattern of travel, corroborate evidence, and arrest targets. During the course of my investigations, I have used electronic data and evidence to identify parties to the crime, the commission of criminal offense and identify the intent, motive, manner and means. Based on my training, experience, and participation in firearms trafficking investigations and associated financial investigations involving firearms, machineguns and machinegun conversion devices ("MCD"), I know and have observed the following:

a. I have learned about the manner in which individuals and organizations illegally sell firearms and MCD in Wisconsin as well as in other areas of the United States;

b. I am familiar with the coded language used over the telephone and other communication platforms to discuss firearms trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe firearms and MCDs;

c. I know firearms traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the firearm traffickers, the firearm traffickers actually own, use and exercise dominion and control over these assets;

d. I know firearms traffickers frequently maintain, on-hand, large amounts of U.S. currency to maintain and finance their ongoing firearms business;

e. Firearms traffickers frequently possess their own firearms and ammunition to protect themselves while caring out their illegal activities;

f. I know it is common for persons involved in firearms trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of firearms and MCD proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

2

g. I know it is common for firearms traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

h. It is common practice for individuals who are involved in business activities of any nature, to include firearm and drug trafficking, to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

i. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

j. I know firearm traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct firearms trafficking activities;

k. I know when firearm traffickers amass large proceeds from the sale of firearms and MCDs, the firearms traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, firearms traffickers use the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

l. I know firearm traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m. I am familiar with computers, cellular telephones, pagers and their uses by firearm traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions. I also know that firearm traffickers use these devices to record their transactions and aspects of their lifestyle related to illegal firearm dealing, whether in the form of voicemail, email, text messages, video and audio

3

clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

n.  Specifically, I know the following information can be retrieved from such devices to show evidence of use of the device to further the firearm trafficking and/or money laundering activities: stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

5.  Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachment A, for violations of federal law, including violations of 18 U.S.C. § 922(o) (Unlawful possession of Machinegun), 26 U.S.C. § 5861(a) (Engaging in the Business of Dealing in NFA Firearms), 18 U.S.C. § 371 (Conspiracy), 21 U.S.C. § 841 (distribution of controlled substances), and 18 U.S.C. § 922(g)(1) (Possession of Firearm by a Convicted Felon), collectively referred to as the Target Offenses.

6.  I am currently participating in an investigation of Irving ALANIS ("ALANIS"), Alexander SILVA-ALVAREZ ("SILVA-ALVAREZ"), and their associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) reports prepared by, and information obtained from, other federal and local law enforcement agents and officers; (c) information obtained from witnesses, including confidential sources; (d) Grand Jury subpoenaed and court ordered records; and (e) Pen register trap and trace and ping data for TARGET TELEPHONE 1 ((385)-466-7398) (used by ALANIS) , TARGET TELEPHONE 2 ((414)-870-3317), and TARGET TELEPHONE 3 ((262)-666-2846) (both used by SILVA-ALVAREZ).

## II.    PURPOSE OF AFFIDAVIT

### A.    Individuals To Be Arrested.

7.    This affidavit is being submitted in support of both applications for search warrants and a criminal complaint naming the following individuals:

|   | Name | Date of Birth |
|---|------|---------------|
| 1 | Irving ALANIS | April 5, 2003 |
| 2 | Alexander SILVA-ALVAREZ | July 31, 2003 |

### B.    Persons, Places and Things To Be Searched.

8.    For the reasons discussed herein, there is probable cause to believe that located at, on, or in the following properties and persons, more fully described in Attachment A, are items that constitute evidence of the Target Offenses.

    a. 4242 W Willow Way, Milwaukee, WI 53221 (Irving ALANIS's residence) ("**Target Location 1**");

- 4242 W Willow Way, Milwaukee, WI is a 3-story single family home. The residence is located on the northeast corner of the intersection of S 43rd Street and W. Willow Way. The siding of the residence is stone and tan siding on the south and west side of the residence and tan siding on the north and east side of the residence. There is an attached two car garage with two single car garage doors and a driveway on the west side of the residence. The front door is located on the south side of the residence. The numbers "4242" is on top of the black mailbox which is located on the south side and front entrance of the residence close to the sidewalk.

- Over the course of this investigation, case agents have observed 3 controlled purchases of firearms and MCD during which Irving ALANIS left this residence, went to the deal location, and then returned to this residence without making any other stops.  Case agents have also observed ALANIS get picked up at this residence by SILVA-ALVAREZ go to a controlled purchase of a firearm and MCD. Location data or "pings" related to TARGET TELEPHONE 1 and

5

surveillance of ALANIS and this residence all indicated ALANIS lives at this residence. ALANIS was last observed at his residence on June 16, 2025.

- Based on numerous instances of surveillance, case agents know that ALANIS primarily operates a Nissan Altima and has used this Altima to facilitate firearms and MCD transactions. The Altima is described as a 2023 Nissan Altima - Black (WI AVH1119, VIN #1N4BL4DW9PN334665) (hereinafter **Target Vehicle 1)**. Case agents have observed ALANIS operating **Target Vehicle 1** within the last 7 days and have seen this vehicle parked in the driveway at this location as recently as June 16, 2025.

Figure 1



Figure 2



b. 4331 S 76th St, Greenfield, WI 53220 (Alexander SILVA-ALVAREZ's residence) ("**Target Location 2**") (collectively with **Target Location 1**, the **Target Premises**);

- 4331 S 76th St, Greenfield, WI is a two-story single-family home on west side of S 76th St just south of W Cold Spring Rd. The siding for the residence is stone and dark green siding. The front access door for the residence on the east side of the residence. There is also a side entrance door on the south side of the residence. Surveillance has observed both doors be utilized, with the south side door as the primary door that is utilized. There is a detached two car garage on the southwest side of the property. A black and brown mailbox is located in front of the residence near the sidewalk with the numbers "4331" located on the mailbox in black numbering outline in a white rectangle.

- Over the course of this investigation, case agents have observed 3 controlled purchases of firearms, MCDs, and items SILVA-ALVAREZ present as firearms, during which SILVA-ALVAREZ leave this residence, go to the deal location, and then go back to this residence. Case agents have also observed a firearms deal and a hand-to-hand of a controlled substance take place in the driveway of the residence. Pings of TARGET TELEPHONE 2 and TARGET TELEPHONE 3 and surveillance of SILVA-ALVAREZ and this residence, all indicate SILVA-ALVAREZ lives at this residence. SILVA-ALVAREZ was last observed at his residence on June 16, 2025.

- Based on numerous instances of surveillance, case agents know that SILVA-ALVAREZ primarily operates a Ford Explorer and has used this Explorer to

facilitate firearms and MCD transactions. The Explorer is described as a 2023 Ford Explorer - Black (WI AYZ4967, VIN #1FM5K8GC9MGA38611) (hereinafter **Target Vehicle 2;** collectively with Target Vehicle 1, the **Target Vehicles**). Case agents have observed SILVA-ALVAREZ operating **Target Vehicle 2** within the last 7 days and have seen this vehicle parked in the driveway of this residence as recently as June 16, 2025.

Figure 1



Figure 2



c. The persons of ALANIS and SILVA-ALVAREZ; and,

8

d.  Any cellular devices found on ALANIS's person; SILVA-ALVAREZ's person; in the **Target Premises**, or in the **Target Vehicles** (collectively, the **Target Devices).**

8.  This Affidavit is being submitted in support of the requested criminal complaints, arrest warrants, and search warrants and does not set forth all my knowledge about this matter.  There is probable cause to believe that Irving ALANIS and Alexander SILVA-ALVAREZ have committed the TARGET OFFENSES, such that evidence of their crimes will be found in the **Target Premises**, **Target Vehicles**, and **Target Devices.**

### III.    BASIS OF INFORMATION

9.  I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.  my experience investigating illegal firearms dealing and firearms trafficking;

b.  oral and written reports, and documents about this investigation that I have received from members of the ATF, local law enforcement, and other federal law enforcement agencies;

c.  discussions I have had personally concerning this investigation with experienced firearm investigators;

d.  physical surveillance conducted by the ATF and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e.  public records;

f.  telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g.  statements from confidential informants;

h.  controlled purchases of firearms and machinegun conversion devices; and,

i.  court ordered precision location data ("pings") from telephone service providers for TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3,

9

10. Since this affidavit is being submitted for the limited purpose of securing the requested criminal complaint, arrest warrants, and search warrants, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for the requested criminal complaints and warrants.

11. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

### IV.     TARGET MEMBERS

12. Information about the targets of this investigation comes from the following sources and criminal indices: observations made during surveillance, analysis of phone tolls, the installation of pen register/trap and trace devices, interviews conducted with a confidential informant, information obtained from other law enforcement officers, controlled evidence purchases, warrants obtained authorizing location data for cellphones, and warrant obtained for the data on Irving ALANIS's iCloud. Through a review of that information, the following persons have been identified and for whom there is sufficient personal or criminal history information to ensure their accurate identification:

- **Irving ALANIS, aka "Milhouse"**- Irving ALANIS is a firearms trafficker selling firearms and machinegun conversion devices. ALANIS resides at 4242 W Willow Way Milwaukee, Wisconsin (**Target Location 1**). ALANIS has been arrested approximately 4 times, including arrests for Possess w/ Intent-THC, Resisting or Obstructing an Officer, Carry Concealed Weapon, Manufacture/Deliver THC and Possess of Marijuana. ALANIS is the known user of TARGET TELEPHONE 1.

10

- o Case agents have conducted at least 4 controlled buys involving ALANIS. Case agents have purchased 5 firearms and 5 MCD in the controlled buys involving ALANIS.

- **Alexander SILVA-ALVAREZ, aka "Chuky"**- Alexander SILVA-ALVAREZ is a firearms trafficker selling firearms and machinegun conversion devices. SILVA-ALVAREZ resides at 4331 S 76th ST Greenfield, Wisconsin (**Target Location 2**). SILVA-ALVAREZ has been arrested approximately 6 times, including arrests for Operate Vehicle W/O Consent-Passenger, Theft Movable Property, 1st Degree Reckless Injury, Manufacture/Deliver THC, Possess w/Intent-THC, Possession of Drug Paraphernalia, Possession of Marijuana, and Prohibited Possession of a Firearm. SILVA-ALVAREZ is a convicted felon. SILVA-ALVAREZ is the known user of TARGET TELEPHONE 2 and TARGET TELEPHONE 3.

  - o Case agents have conducted at least 3 controlled buys involving SILVA-ALVAREZ. Case agents have purchased 3 firearms and 3 MCD in the controlled buys involving SILVA-ALVAREZ. Case agents have also observed SILVA-ALVAREZ receive a firearm in the driveway of **Target Location 2**.

- **Armando ALANIS Sr.** – Armando ALANIS Sr. is the father of Irving ALANIS and is currently illegally in the United States. ALANIS Sr. resides at 4242 W Willow Way Milwaukee, Wisconsin (**Target Location 1**). ALANIS Sr. has been arrested approximately 2 times, including arrests for aggravated battery/intent-great harm and failure to appear. ALANIS Sr. has been encountered by Immigration and Customs Enforcement approximately 5 times and has been confirmed by case agents of being in the United States illegally.

11

- **Hector SILVA-TINAJERO**- Hector SILVA-TINAJERO is the father of Alexander SILVA-ALVAREZ and is currently illegally in the United States. SILVA-TINAJERO resides at 4331 S 76th ST Greenfield, Wisconsin (**Target Location 2**). SILVA-TINAJERO has been arrested approximately 3 times, including arrests Obstructing a Police Officer, Operate W/O Valid License, and Possession of Narcotic Drugs. SILVA-TINAJERO has never been encountered by Immigration and Customs Enforcement approximately and has been confirmed by case agents of being in the United States illegally.

## V.     SUMMARY OF PROBABLE CAUSE

### A.     Summary of Investigation

13.     In approximately January 2025, the ATF received information concerning individuals involved in the illegal selling of firearms and machinegun conversion devices in Milwaukee, WI, utilizing Telegram channels, "TheMenu" and "MilhouseMenu". The Waukesha Police Department and the ATF initiated an investigation into these individuals and identified Irving ALANIS and Alexander SILVA-ALVAREZ as the two individuals running the Telegram channels.

14.     ATF and WPD, utilizing a WPD Confidential Informant, conducted two controlled purchases between January 30, 2025, and February 21, 2025, from ALANIS. Both controlled purchases where for a Glock handgun with a machinegun conversion device attached. Between February 26, 2025, and March 26, 2025, two additional controlled purchase were conducted. These controlled purchases were arranged with and conducted by SILVA-ALVAREZ. They were for a total of three Glock handguns and three machinegun conversion devices, two of which were already attached to the Glock handguns. ALANIS was also involved in these deals. During the

12

first buy from SILVA-ALVAREZ, ALANIS was picked up by SILVA-ALVAREZ and was at the deal. During the second buy from SILVA-ALVAREZ, ALANIS met SILVA-ALVAREZ at the deal location and installed one of the MCD on to the firearm.

15.     Between April 1, 2025, and April 10, 2025, a third controlled buy was arranged with SILVA-ALVAREZ for firearms. During this time, while the deal was being arranged, surveillance observed SILVA-ALVAREZ receive a firearm from an unidentified individual in a BMW. This occurred in the driveway at 4331 S 76th St Greenfield, WI. (**Target Location 2**) and less than two hours later SILVA-ALVAREZ sent a photo to the CI of firearms he was going to sell the CI. When the CI meet SILVA-ALVAREZ for the purchase of three firearms, SILVA-ALVAREZ instead sold the CI items not agreed upon.

16.     During the course of this investigation the court authorized law enforcement to receive pen register trap and trace and ping data for ALANIS's phone ((385)-466-7398, TARGET TELEPHONE 1), SILVA-ALVAREZ's phone ((414)-870-3317, TARGET TELEPHONE 2) and SILVA-ALVAREZ's new phone ((262)-666-2846, TARGET TELEPHONE 3) when he changed numbers from the 3317 number to the 2846 number. Ping data from this has also corroborated ALANIS and SILVA-ALVAREZ working together in the during the controlled purchases. This ping data also indicated that ALANIS and SILVA-ALVAREZ slept at **Target Location 1** and **Target Location 2**, respectively, as their first and last pings of the day would be that those respective locations.

17.     During the court of this investigation the court also authorized a search warrant for Irving ALANIS's iCloud accounts. The data provided by Apple covers a time frame of April 2023 to September of 2024 and showed a history of actions and communications that are consistent with individuals who are engaged in illegal activities, to include the selling of controlled substances and the illegal selling and trafficking of firearms. It also showed, through

13

the associated metadata, that some of these activities were associated with 4242 W Willow Way Milwaukee, WI (**Target Location 1**) and 4331 S 76th St Greenfield WI (**Target Location 2**).

18.     Through the course of the investigation case agents also learned and confirmed with Immigration and Customs Enforcement that Armando ALANIS Sr, the father of Irving ALANIS, and Hector SILVA-TINAJERO, the father of Alexander SILVA-ALVAREZ, are currently in the United States illegally.

## VI.     SOURCES OF INFORMATION

19.     Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives and local officers have received information concerning the illegal sales of firearms and machinegun conversion devices by Irving ALANIS and Alexander SILVA-ALVAREZ from the following:

   a.  CI 1: Waukesha Police Department Confidential Informant 25-4 (hereafter CI) has been working with law enforcement since January of 2025. The CI has provided information on ALANIS and SILVA-ALVAREZ, which led ATF and WPD to start an investigation into them. CI has a criminal history that includes a non-criminal disorderly conduct conviction. CI is currently working towards consideration on a Possession with Intent THC charge in Waukesha County and has also received monetary compensation for his work. Based on my experience with CI, my conversations with other agents about CI, and my work on this investigation to date, I believe CI to be truthful and reliable.

## VII.     FACTS ESTABLISHING PROBABLE CAUSE

20.     In the probable cause section below, I have attempted to first describe the progress of the investigation on Irving ALANIS and Alexander SILVA-ALVAREZ, followed by summary provisions regarding the persons to be arrested and the locations to be searched, for ease of reference.

14

**Debrief of CI – January 21, 2025**

21.     On January 21, 2025, ATF and WPD debriefed the CI where the CI provided information on an individual they know as "Millhouse". Law enforcement later identified "Millhouse" as Irving ALANIS using a known photograph of the same. The CI advised they have bought marijuana from ALANIS in the past and they know ALANIS to sell fully automatic AR pistols and Glocks with machinegun conversion devices (MCD) attached. They explained ALANIS would advertise these firearms for sale on a private Telegram group.

**First CI Buy From Irving ALANIS – January 30, 2025**

22.     On January 22, 2025, the CI reached out to ALANIS, at phone number 385-466-7398, (TARGET TELEPHONE 1) asking if ALANIS had a Glock with a button on it, to which ALANIS responds, let me ask my guy. Through training and experience I know that a button is referring to a machinegun conversion device that is put on the back of a Glock style pistol. On January 28, 2025, ALANIS told the CI that "He" (referring to ALANIS' guy) got a 19x with a gold button for 1,250 obo," pictured below. ALANIS and the CI agreed to meet on January 30, 2025.



23.    On January 29, 2025, ALANIS sent the CI a photo of the firearm, that was later purchased, with ALANIS stating that he will put a gold button on it. These messages are pictured below.

 

24.    On January 30, 2025, the CI asked ALANIS for an address to meet at. ALANIS provided the CI an address of 3531 W Verona Ct Milwaukee, WI 53215. A law enforcement data base check shows that the residence of ALANIS is 4242 W Willow Way Milwaukee, WI 53211 (**Target Location 1**). This residence is less than one mile from the address ALANIS provided as the meet location for selling the CI the Glock with the MCD. WPD set up surveillance on 4242 W Willow Way (**Target Location 1)** prior to the deal.

25.    At approximately 1420 hours, while doing surveillance at 4242 W Willow Way (**Target Location 1**), WPD observed a male, wearing all black with a black mask, carrying a black bag, exit 4242 W Willow Way and enter a sedan, bearing Wisconsin registration AVH1119, pictured

below. This individual was later identified as ALANIS. WI plate AVH1119 comes back registered as a Black Nissan Altima, listed to an Armando Alanis with an address of 4242 W Willow Way, Milwaukee, WI.



26.    WPD followed the Altima until it reached the deal location. The Altima parked directly behind the CI's vehicle. At approximately 1424 hours, the CI exited their vehicle and approached the Altima. The CI entered ALANIS's Altima and sat in the front passenger seat. The CI, approximately 1 minute later, then exited the Altima and entered their vehicle. At approximately 1425 hours the deal was completed. ATF SAs and WPD followed the CI to a pre-designated location for a debrief.

27.    The CI stated they sent a text message to ALANIS stating he arrived at the buy location, and ALANIS replied that he was near. The CI stated that ALANIS arrived in a black Nissan, and they got into ALANIS vehicle. CI stated ALANIS handed him the firearm, and CI handed ALANIS the money. They "dapped" (referring to a street handshake) each other up, and the CI left the vehicle. No conversation relating to the buy occurred. The firearm that was purchased for

17

$1,250 and was a GLOCK INC Model: 19 Caliber: 9 Type PISTOL S/N: AGTL281 with a gold and purple MCD attached pictured below.



28.     The CI stated they purchased the firearm from "Millhouse" and showed a photo of the person they bought from. CI also confirmed that this was the same person they had purchased marijuana from multiple times in the past. The CI showed the photo, which is the same photo that ATF SA found on a Facebook profile for Irving ALANIS, pictured below.



29.     During the deal the CI was equipped with an audio and recording device. Review of video showed the CI getting out of their vehicle, getting into a different vehicle, known to be the

Altima based off of law enforcement surveillance of the deal, the interior roof of the Altima, the CI getting out of the Altima and back in their vehicle and the firearm purchased in the CI vehicle. Review of the audio showed the CI and ALANIS greeting each other.

30.     During the aforementioned deal, the Milwaukee Police Department (MPD) was working surveillance on ALANIS's residence at 4242 W Willow Way Milwaukee, WI 53221 (**Target Location 1**) for a separate MPD case. MPD advised that they observed ALANIS leave the residence wearing all black with a black bag. SAs shared a photo with MPD that was taken by WPD while on surveillance at ALANIS residence, pictured below. MPD confirmed that they believed it was Irving ALANIS. Members of MPD also stated that they had conducted surveillance on ALANIS multiple times in the past and knew him to drive the same Nissan vehicle he used to meet with the CI.



**Second CI Buy From Irving ALANIS –February 21, 2025**

31.     On February 7, 2025, the CI sent a text message to ALANIS asking about purchasing another full auto or a switch. ALANIS replied that he can see but that he did not have anything at that moment. On February 10, 2025, the CI sent a text message to ALANIS asking if he had any

controlled substances available to sell to the CI's uncle. ALANIS asked what the uncle was trying to buy and sent a message stating, "I gotta talk to primo first see if it's even worth sending him yall his way" pictured below. Through training and experience I know that individuals who sell large quantities of narcotics do not want to waste their time selling small amounts to individuals because it is not financially worth the associated risk.



32.     On February 18, 2025, ALANIS sent a text message to the CI about selling an FN509 for $1,200. ALANIS sent both a photo and details of accessories that would come with it. ALANIS also sent the CI a text message stating, "Might have another 19x with button" (pictured below). Based off the past deal the CI had with ALANIS and training and experience I know that 19x is referring to a Glock 19x pistol. Also, that a button is referring to a machinegun conversion device.



33.    Later that day on February 18, 2025, ALANIS let the CI know that the Glock 19 with a switch was available and sent the CI a message saying "1250 same as lone one bro if you want it". CI and ALANIS agreed to meet on February 21, 2025, for the sale of that Glock with a switch (pictured below).



34.    On February 19, 2025, ALANIS then sends a photo of the Glock 19 and then on February 20, 2025, ALANIS sent a message "Bet fam ima go get the thing installed today so it will be ready for tomorrow" (pictured below). I know that ALANIS is referring to the switch as the thing to be installed based off the photo of the firearm he sent not having a switch on the back of it, wanting the firearm to be ready for tomorrow (date of the deal), and that he agreed to sell a Glock with a switch.

35.     At approximately 1255 hours, on the day of the deal, the CI's E/S equipment was activated at the pre-designated location and at approximately 1300 hours, CI departed the pre-designated location en route to the agreed upon deal location of 2967 S 37th ST Ct Milwaukee, WI 53215. CI arrived at the deal location at approximately 1308 hours. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location WPD maintained surveillance of the CI during the deal.

36.     At approximately 1320 hours, WPD observed a sedan, bearing Wisconsin registration AVH-1119 pull up behind the CI's vehicle (pictured below). Wisconsin plate AVH-1119 comes back to a Nissan Altima and is the same vehicle ALANIS drove to the first buy between the CI and him. At approximately 1320 hours the CI exited their vehicle and approached the Altima. The CI entered the Altima and sat in the front passenger seat. Approximately 1 minute later the CI got out of the Altima and got back into their car, and the Altima departs the deal location.



37.     At approximately 1321 hours the deal was completed. ATF and WPD followed the CI from the deal location to the pre-designated location. ATF took possession of the firearm that was purchased for $1,250, pictured below. The CI and the CI's vehicle was searched again, finding no contraband. The E/S was deactivated, and the CI was debriefed by ATF and WPD. The firearm

22

purchased was a GLOCK GMBH; Model: 19X; Caliber: 9; Type: PISTOL; S/N: BTEF544 with a green MCD attached.



38.     During the debrief the CI stated ALANIS sent a text message regarding a meet location of 2967 S 37th ST Milwaukee WI. The CI sent a text message that they arrived, and ALANIS sent a message back that he is on his way and that he was pulling up (pictured below).



23

39.     The CI stated that during the deal ALANIS explained to the CI that he took the larger back strap of the firearm off because the slide of the firearm was not going all the way forward and the switch was scratching it. ALANIS gave the larger back strap to the CI as part of the purchase.

40.     The CI also stated that they purchased from "Milhouse" and that it is the same individual they purchased from on the last deal. "Milhouse" has previously been identified as Irving ALANIS. CI also stated that ALANIS arrived in the same Altima that he arrived in at the last deal. The CI explained that the individual they purchased from does not have any finger tattoos but does have a hand tattoo of the clown from the movie IT. I know from Facebook photos and profile pictures of Irving ALANIS that he does not have finger tattoos while his brother Armando Alanis does. A Facebook profile picture of Irving ALANIS shows the clown from the movie IT tattooed on his hand (pictured below)



41.     The CI also stated that during the deal they noticed that ALANIS had an additional firearm. This firearm was shoved in between the driver seat and center console. Through training and experience I know that individuals illegally dealing in firearms also will carry a firearm for their protection and that the location described by the CI is a common spot for these individual to have their firearms.

42.     The CI was also shown photos that WPD took of Irving ALANIS when he got back to his residence (**Target Location 1**) after the deal (pictured below). The CI confirmed that this is the same individual they purchased from.



43.     Immediately following the completion of the deal Milwaukee Police Department (MPD) and ATF followed the Altima. The Altima drove back to 4242 W Willow Way Milwaukee WI, (**Target Location 1**) the residence of Irving ALANIS and did not make any stops between the deal location and 4242 W Willow Way. WPD observed the Altima pull up to 4242 W Willow Way and ALANIS enter the residence both pictured below.



44.     Review of audio and video that the CI used to record the buy confirms that ALANIS talks to the CI explaining why he took the larger back strap off the firearm he sold to the CI. Video shows the handing off the firearm from the individual in the driver seat to the CI in the passenger seat. Due to the angle and lighting of the video, the face of the dealing individual was not shown clearly. However, we can say with certainty that this individual is ALANIS based off of surveillance, having seeing only ALANIS get in the Altima prior to the deal, the CI confirming only one person was in the car and surveillance observing the Altima leave the deal, go back to 4242 W Willow Way and no one other than ALANIS get out of the Altima.

### Identification of Alexander SILVA-ALVAREZ

45.     On January 21, 2025, ATF, met with WPD and the CI at the WPD.  During this meeting, CI was familiar with a subject known as "Chuky" and a subject known as "Millhouse". The CI believed that the two were cousins with each other and stated that they both utilize Telegram Messenger to sell fully automatic firearms as well as semi-automatic firearms.  The CI showed ATF and WPD the Telegram Messenger account "TheMenu" and stated that both "Chuky" and "Millhouse" use this account to sell firearms.

46.     On February 21, 2025, ATF and WPD met with the CI. The CI showed ATF and WPD posts from the Telegram Messenger page "TheMenu".  CI knows the person running the page to still be "Chuky".  Through the Telegram Messenger page, the CI was able to provide ATF and WPD with an Instagram account (solow1008), a Snapchat account (solowstashin24), and a phone number (414-870-3317 TARGET TELEPHONE 2). Below are two photos taken from "TheMenu" Telegram Messenger page. It should be noted that one minute prior to the aforementioned post of the tan Glocks for sale, there is an advertisement for a Glock 19 with a "gold button" for $1,300. Button is a common slang for a machine gun conversion device (MCD).

26

 

47.     The CI recalled meeting Chuky in person one time approximately one year ago at the Sphinx Vape and Smoke located at the intersection of S 76th St and W Howard Ave.  The CI believed that Chuky was cousins with Irving ALANIS. The CI thought that Chuky was most likely the person that ALANIS is getting his firearms from that he has been advertising/selling to the CI.  The CI showed ATF and WPD the Telegram Messenger page "TheMenu" and pointed to a recent listing for two different tan Glock handguns.  The CI noted that the tan Glock without the threaded barrel extension looked very similar to the Glock that the CI arranged to purchase from ALANIS later that day.

48.     Later on, February 21, 2025, the CI purchased a tan Glock pistol with a machine gun MCD affixed to the back from ALANIS. After the purchase was completed, the CI stated they received a notification on their phone from Telegram that said Channel Photo Not Visible. The CI noted that on "TheMenu" Telegram Messenger page the listing for the tan Glock was removed. Below is a photo of the "TheMenu" page with the photo no longer shown.



49.     On February 24, 2025, ATF conducted a law enforcement database check of the phone number 414-870-3317 (TARGET TELEPHONE 2) and observed that it belongs to an Alexander SILVA-ALVAREZ. ATF also conducted a law enforcement database check of SILVA-ALVAREZ, which showed that SILVA-ALVAREZ is a convicted felon with the most recent felony conviction from 2024. A check of Facebook showed an individual on that service as "Solow Stashin". "Solow Stashin" is also friends with both of Irving ALANIS's Facebook pages as well as Armando ALANIS and Amairany ALANIS, who are all brothers and sisters. The CI was shown the profile photo from "Solow Stashin" Facebook page and the CI confirmed that that was "Chuky". A comparison was made of the Facebook photo of "Solow Stashin" to the Driver's License photo of SILVA-ALVAREZ, and they appear to be the same person. It is also noted that in the Facebook profile photo of "Solow Stashin," he is holding a large stack of U.S. currency. The stack of currency matches the same stack of U.S. currency that is shown in the profile picture of the Telegram Messenger page "TheMenu". In the Facebook photo SILVA-ALVAREZ is wearing sunglasses with diamonds over the bridge of the nose. In the "TheMenu" Telegram Messenger page the subject in

28

the photo is holding the same style sunglasses. In both photos the subject appears to be wearing the same black shirt. Below is a side-by-side comparison of the photos.

 

Telegram Messenger "TheMenu"                    "Solow Stashin" Facebook Photo

50.     When comparing in Google Maps the listed address of SILVA-ALVAREZ, 4331 S 76th St. Greenfield WI, (**Target Location 2**) to that of the Sphinx Vape and Smoke where the CI met SILVA-ALVAREZ, it shows that they are approximately 0.5 miles from each other.

**First CI Buy from Alexander SILVA-ALVAREZ/ Third Buy from Irving ALANIS – February 26, 2025**

51.     On February 25, 2025, the CI reached out to SILVA-ALVAREZ on his Telegram account, account name "Chuky", asking if he still had the gold button for sale. Previously, on February 23, 2025, a gold button was posted for sale on the telegram page TheMenu (pictured below left). SILVA-ALVAREZ told the CI that button was still available. They agreed on a price of $400 and to meet the following day (pictured below right).

29

 

52.     On February 26, 2025, at approximately 1212 hours, the CI E/S was activated at a pre-designated location and moments later the CI arrived at the deal location of 1802 S 44th ST Milwaukee, WI 53214. The CI was under constant surveillance by ATF and WPD while at the pre-designated location and the deal location from the time the E/S was activated through the completion of the deal.

53.     WPD set up surveillance at approximately 1100 hours at SILVA-ALVEREZ residence, 4331 S 76th ST Greenfield, WI 53220 (**Target Location 2**). WPD observed a black Nissan Altima with WI plate AVH1119 pull into the driveway of SILVA-ALVAREZ residence at approximately 1110 hours, SILVA-ALVAREZ get into the vehicle (pictured below) and depart a few minutes later. This Altima is the same Altima that ALANIS drove to the prior two deals.



54.     At approximately 1300 hours surveillance observed the Altima with WI plate AVH1119 pull into the driveway of 4331 S 76th St (**Target Location 2**) and depart approximately a minute later from that address. At approximately 1332 hours SILVA-ALVAREZ departed 4331 S 76th St in a black Ford Explorer WI license plate AYZ4967 (pictured below left). This plate comes back to a Hector Silva with a DOB of 3/11/1976. Surveillance maintained constant surveillance of the Ford Explorer. At approximately 1340 hours the Explorer pulled into the alleyway of 2128 S 59th St West Allis, WI 53219. At that point, 3 Hispanic males in their 20s approached the driver side of the Explorer and a few minutes later the Explorer departed the alleyway. From there the Explorer drove to 4242 W Willow Way, Milwaukee, WI 53221 (**Target Location 1**) arriving at approximately 1356 hours (pictured below right) and departed 4242 W Willow Way at approximately 1359 hours. From there the Explorer arrived at the Arby's at 1661 Miller Park Way, West Milwaukee, WI 53214 at approximately 1407 hours. This Arby's is only one block away from the deal location and at approximately 1410 hours the Explorer arrived at the deal location.

 

55.     At approximately 1410 hours, WPD observed the Explorer pull up next to the CI's vehicle (pictured below left). At approximately 1410 hours the CI exited their vehicle and got into the back passenger seat of the Explorer. The Explorer pulled away from the deal location and parked

31

on 44th not far from the deal location. Shortly after the Explorer circled the block and returned to the deal location. The CI left the Explorer and got back into their vehicle at approximately 1412 hours and the deal was completed. The Explorer and CI were under constant surveillance during the deal. The firearm purchased was a GLOCK GMBH; Model: 19X; Caliber: 9; Type: PISTOL; S/N: CDUT644 and was purchased for $1,200 (pictured below middle). The MCD purchased was a gold Glock switch and was purchased for $400 (pictured below left). The total cost was $1,600.

  

56. During the day of the deal the CI stated they reached out to SILVA-ALVAREZ on his Chuky Telegram account asking if SILVA-ALVAREZ had any Glocks or other firearms for sale. SILVA-ALVAREZ replied that he has a 19x mos. Through training and experience I know that 19x mos is referring to a type of Glock pistol. SILVA-ALVAREZ also provided the CI a phone number of 262-277-6427 and told the CI to reach on that phone number because the one they are communicating on is about to die. SILVA-ALVAREZ told the CI that the 19x would be $1,200 (all pictured below left). SILVA-ALVAREZ and the CI agreed on the total price of $1,600 and the CI provided SILVA-ALVAREZ with the address of the deal location. SILVA-ALVAREZ later on that day reached back out to the CI provided the phone number of 414-870-3317 (TARGET PHONE 2) and to have the CI call SILVA-ALVAREZ. This is pictured below in the middle and the picture shows that the CI placed an outgoing call to the Chuky Telegram account. On this call you can hear SILVA-ALVAREZ ask the CI if the CI wants SILVA-ALVAREZ to put the MCD on or have the

32

CI do it themselves. They also discuss where they want to meet to do the deal. When selecting the phone number of 414-870-3317 (TARGET PHONE 2) that SILVA-ALVAREZ sent the CI it shows that the profile associated with the number is SILVA-ALVAREZ's Chuky profile (pictured below right). I know from training and experience that Telegram requires you to have a phone number to make an account and if you do not manually change your settings to hide your phone number that is tied to your account then the phone number and account will show that they are connected. The Chuky Telegram profile and the communications the CI had on this account with SILVA-ALVAREZ are all tied to the phone number of 414-870-3317 (TARGET TELE PHONE 2).

  

57.     The CI switched to the other phone number (262-277-6427) SILVA-ALVAREZ provided and reached out via that number in Telegram. That number is linked to the Telegram account of Dra Ko. SILVA-ALVAREZ told the CI that his phone died, and he will be leaving the gym soon. About 40 minutes later, at approximately 1249 hours, SILVA-ALVAREZ told the CI that he is leaving the gym now and asked for an address. The CI provided the address of the deal location (all pictured below left). When selecting the phone number of 262-277-6427 that SILVA-ALVAREZ sent the CI. it shows that the profile associated with the is SILVA-ALVAREZ's Dra Ko

33

profile (pictured below right). The Dra Ko Telegram profile and the communications the CI had with SILVA-ALVAREZ on this account are all tied to the phone number of 262-277-6427.

 

58.     During the deal the CI stated that a newer black SUV pulled up to their vehicle and that they tried getting into the front passenger seat of the vehicle but that there was a person sitting there so they got into the back passenger seat. The CI stated that the driver was the person that they know as "Chuky". The CI stated SILVA-ALVAREZ was wearing a black shirt and had no mask on while the passenger was wearing a black hooding and mask. The CI stated the passenger was short like ALANIS but could not tell for certain if the passenger was ALANIS. The CI stated that the passenger did not say anything while the CI was in the Explorer.

59.     The CI stated that SILVA-ALVAREZ described the features of the firearm he was selling, told the CI where to put the MOS sight, and asked if the CI knew how to put on the MCD. I know from training and experience that MOS stands for Modular Optic Systems and that it is a type of sight for firearms. SILVA-ALVAREZ also asked if the CI was going to sell the firearm, and the CI said they are selling the firearm. SILVA-ALVAREZ also told the CI that the firearm is clean but

34

the person they got it from said it was stolen. I know from training and experience that describing a firearm as "clean" means it has not been used in a shooting.

60.     Review of audio confirms SILVA-ALVAREZ describes the features of the firearm he was selling, where to put the MOS sight ,and asking the CI if they knew how to put on the MCD. It also confirms SILVA-ALVAREZ asked the CI if they were going to sell the firearm. SILVA-ALVAREZ stated the firearm was clean and that his guy SILVA-ALVAREZ got the firearm from said he got it from the store and reported it stolen. A National Crime Information Center (NCIC) check of the firearm shows that the firearm is not currently reported stolen. SILVA-ALVAREZ also told the CI that the firearm was also only shot in the range and tells the CI again that it is not dirty. SILVA-ALVAREZ also tells the CI to be smooth with the firearm. From training and experience I understand this to mean that SILVA-ALVAREZ is telling the CI to be careful not to get caught with the firearm. Video shows the CI getting out of their car and into the back passenger seat of a black SUV and approximately 2 minutes later the CI getting out of the black SUV and back into their vehicle. The firearm purchased can also be seen on camera once the CI gets back into their vehicle. Due to the angle of the camera, it was unable to capture either the driver or the front passenger.

61.     On February 21, 2025, the Honorable Judge Joseph granted a location data warrant for Irving ALANIS's phone number of 385-466-7398 (TARGET TELEPHONE 1). During the day of the deal the location data was being monitored. The location data shows that ALANIS's phone was pinging in the area of SILVA-ALVAREZ address (**Target Location 2**) at 1123 hours, which is not long after the Altima pulled in the driveway of SILVA-ALVAREZ residence. The next ping of ALANIS's phone was in the area of 27th and College in Greenfield from 1138 hours to 1253 hours. In this area is a gym and SILVA-ALVAREZ told the CI at 1249 hours that he was leaving the gym now. The pings show ALANIS's phone moved on a path that is consistent with driving from the gym to his residence. It should be noted that Google maps has the driving time between ALANIS's

35

address of 4242 W Willow Way (**Target Location 1**) and SILVA-ALVAREZ'S address of 4331 S 76th ST (**Target Location 2**) is 7 minutes. For ALANIS to drive from the gym to SILVA-ALVAREZ residence and then to his residence the ping data would only show one ping between ALANIS's residence and SILVA-ALVAREZ's residence based on the total drive time and frequency of the pings. It would be consistent with the pings that on the drive home from the gym ALANIS stopped at SILVA-ALVAREZ's residence and then his residence, while not pinging around SILVA-ALVAREZ residence. Later, at 1353 hours, ALANIS was pinging in the area of his residence (**Target Location 1**) and the next ping at 1408 hours shows him in the area of deal location (pictured below left). It is highly probable ALANIS was the passenger in the car with SILVA-ALVAREZ base off the phone pings, the Altima showing up to SILVA-ALVAREZ's residence prior to pinging around the gym and SILVA-ALVAREZ telling the CI he was at the gym, the CI description of the passenger's clothing being consistent with what he wore in the last 2 deals, the CI stating the passenger is similar in height as ALANIS, SILVA-ALVAREZ showing up to ALANIS's residence prior to the deal, SILVA-ALVAREZ and ALANIS running the telegram page TheMenu together and finally the firearm purchase was pictured on TheMenu with what is believed to be the same firearm that the CI purchased on the second buy (pictured below right).

 

**Second CI Buy from Alexander SILVA-ALVAREZ/ Fourth Buy from Irving ALANIS –**

**March 26, 2025**

62.     On March 18, 2025, SILVA-ALVAREZ sent a message to the CI, through Telegram, that he had an "invisible switch" and a "regular button." Through training and experience I know that an "invisible switch" refers to a MCD that is attached to a Glock pistol in a way where it is flush to the back slide of the pistol. A "regular button" refers to a MCD that protrudes out of the back of the slide with a button to push that allows the firearm to operate both as a semi-automatic and a full auto. An invisible switch makes the firearm only operable as a full auto. On March 19, 2025, SILVA-ALVAREZ messaged the CI that for one of the MCDs it would be $300 but $250 each if the CI were to purchase both. The CI asked if he had any firearms to go with the MCDs and on March 20, 2025, SILVA-ALVAREZ messaged the CI know that he would try to get some (all pictured below).



63.     Later, on March 20, 2025, SILVA-ALVAREZ messaged the CI that he could not find any firearms but was willing to let go of his 17C. Through training and experience I know that 17C

is referring to a Glock 17C. On March 21, 2025, the CI let SILVA-ALVAREZ know that they would buy the 17C with an MCD. SILVA-ALVAREZ asked if the CI wanted one firearm with a MCD or two and that for the 17C with a MCD it would be $1,500 (pictured below).



64.    On March 22, 2025, the CI again informs SILVA-ALVAREZ that they will purchase the 17C and asked how much for a second firearm. SILVA-ALVAREZ messaged the CI that he has a 22C and on March 23, 2025, the CI asks how much. Through training and experience I know that a 22C is referring to a Glock 22C. On March 24, 2025, SILVA-ALVAREZ messaged the CI it will cost the same price already given of $1,500 and asks the CI when they can meet. The CI let SILVA-ALVAREZ know they could meet on Wednesday, March 26 (pictured below).



65.     On March 25, 2025, SILVA-ALVAREZ messaged the CI that the 22C, that he offered to CI, is already sold but that he still has the 17C with an MCD. SILVA-ALVAREZ also let the CI know that he can look for another firearm to go with the other MCD. They also agree with meeting on March 26, 2025 (pictured below left). SILVA-ALVAREZ again asks the CI if they are good to meet up because his guy is leaving tonight, and SILVA-ALVAREZ can have his guy drop it off so he can have it for tomorrow. This message is understood as SILVA-ALVAREZ is getting either the firearm or the MCD from another individual. Through training and experience I know that individuals who deal illegally in firearms and MCDs will sometimes get either the firearms or MCDs from other individuals prior to selling those items. Later that night SILVA-ALVAREZ lets the CI know that he has a 23 and asks if he can sell that to the CI instead of the 17C because he wants to keep the 17C (pictured below right). Through training and experience I know that a 23 in this context is referring to a Glock 23.

 

66.     On March 26, 2025, the morning of the deal, the CI asked if SILVA-ALVAREZ was willing to sell both firearms previously mentioned above, from communications on March 25, 2025. SILVA-ALVAREZ messaged the CI that for the 17C with a button it would be $1,600 and the 23 with a button it would $1,500. SILVA-ALVAREZ told the CI if they grab both it would cost $3,000. SILVA-ALVAREZ also asked the CI when they would be meeting up and provided the CI with a meet location of 3800 W Burham St, Milwaukee, WI, 53215 (pictured below).



67.     On March 26, 2025, on the day of the deal, the CI's E/S was activated at the pre-designated location and at approximately 1024 hours the CI departed the pre-designated location en route to the agreed upon deal location of 3800 W Burnham St, Milwaukee, WI 53215. CI arrived in the area of the deal location at approximately 1030 hours. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location ATF, WPD, and MPD maintained surveillance of the CI during the deal.

68.     On March 21, 2025, the Honorable Judge Duffin signed off on a location data warrant for Alexander SILVA-ALVAREZ's phone number of 414-870-3317 (TARGET TELEPHONE 2).

During the day of the deal the location data was being monitored. At approximately 1033 hours surveillance units observe SILVA-ALVAREZ leaving his residence of 4331 S 76th St. Greenfield, WI (**Target Location 2**) and get into a Ford Explorer with WI license plate of AYZ4967 (pictured below). This is the same vehicle that SILVA-ALVAREZ has been observed on multiple occasions including past controlled purchases. GPS ping locations on SILVA-ALVAREZ's phone (414-870-3317), showed SILVA-ALVAREZ in the area of his residence (**Target Location 2**) for multiple hours prior to him being observed leaving the residence. Surveillance on the residence also showed that the Explorer was parked for multiple hours in the same spot prior to SILVA-ALVAREZ getting into the vehicle.



69.     ATF and MPD followed SILVA-ALVAREZ in his Explorer to a Walgreen parking lot at 6030 W. Oklahoma Ave. Milwaukee WI. at approximately 1041 hours. During the time that SILVA-ALVAREZ was parked at Walgreens, a GPS location ping showed that at 1043 hours the cell phone with number 414-870-3317 moved with him to the location of the Walgreens. Below is a photo of the location pings showing SILVA-ALVAREZ's movements to and from the controlled purchase. The red arrow points to SILVA-ALVAREZ's location in the area of the Walgreens at 1043 hours.

41



70.     At approximately 1044 hours, MPD observed a white Honda Accord bearing WI license plate of ANT4936 pull up next to SILVA-ALVAREZ. Law enforcement data base check shows license plate ANT4936 is registered to Beatriz Cuna-Ruiz (DOB:11/07/1987) and Santiago Omar CUNA (06/12/2004) at an address of 6154 W Kinnickinnic River Pkwy Milwaukee WI. SILVA-ALVAREZ is then observed getting out of his Explorer and walking to the driver window of the Accord.  SILVA-ALVAREZ is observed conducting a hand-to-hand deal with the male driver of the Accord.  The driver appears to have tight braided black/ dark brown hair and looks to be in his late teens to early 20's. This interaction was recorded on video and below are photographs of SILVA-ALVAREZ conducting the hand-to-hand with the driver. Moments after conducting the hand-to-hand transaction, SILVA-ALVAREZ get back into his Explorer.  SILVA-ALVAREZ and the Accord leave the area in separate directions.



 

71.     At approximately 1050 hours, surveillance units followed SILVA-ALVAREZ to the area of 36th St. and W Grant St. where SILVA-ALVAREZ parked his vehicle facing west bound on Grant St. This location is only a few blocks from the deal location that SILVA-ALVAREZ provided the CI. At approximately 1051 hours, surveillance observed Irving ALANIS leave his residence at 4242 Willow Way, Milwaukee WI (**Target Location 1**) and get into a black Nissan Altima bearing WI license plate AVH1119 (pictured below). ALANIS has been observed in this vehicle multiple times before by law enforcement including previous controlled purchases of firearms.



72.     At approximately 1056 hours, ALANIS is observed arriving in the area of W Grant St. and 36th St. and parking behind SILVA-ALVAREZ. At approximately 1058 hours, SILVA-ALVAREZ is observed leaving his Explorer carrying a pistol with an extended magazine hidden in his pocket and walking to ALANIS' vehicle. Once SILVA-ALVAREZ gets to ALANIS' vehicle, he hands the pistol over to ALANIS. SILVA-ALVAREZ is then observed handing a second smaller object over to ALANIS from a pocket on his right side (the pistol was on his left). ALANIS' arrival in the area and the interaction between him and SILVA-ALVAREZ were video recorded by MPD. Below are photos taken from the recording of SILVA-ALVAREZ and ALANIS interactions. The red arrow in the first photo points to the Explorer which is obstructed by an unrelated GMC SUV. The red arrow in the second photo points to the extended magazine of the firearm SILVA-ALVAREZ handed off to ALANIS.






73.     At approximately 1100 hours, SILVA-ALVAREZ drives from 36th St. and W Grant St. to the CI's location at 37th St. and W Burnam St.  SILVA-ALVAREZ is observed pulling up next to the CI's vehicle and after a short time SILVA-ALVAREZ is observed driving south bound on 37th St. with the CI following him in the CI's vehicle.  During this time, other surveillance units kept eyes on ALANIS who did not move from his location (pictured below).



74.     At approximately 1103 hours, SILVA-ALVAREZ and the CI drive back to ALANIS' location and both park their vehicles along the side of the road.  SILVA-ALVAREZ is then observed going over to ALANIS' vehicle and being handed something through the window. He then goes back to his Explorer and gets into the driver seat.  The CI then gets out of his vehicle and gets into the front passenger seat of the Explorer. At approximately 1104 hours, the CI is observed leaving the Explorer and getting back into the CI's vehicle.  The CI, SILVA-ALVAREZ, and ALANIS all leave the area at approximately the same time.

75.     During the time of the deal the GPS ping location for SILVA-ALVAREZ's phone (TARGET PHONE 2) and ALANIS' phone (TARGET PHONE 1) were being monitored and it showed that both phones were in the same location during the duration of the controlled purchase (pictured below).

45



76. MPD, WPD and ATF units follow both ALANIS and SILVA-ALVAREZ back to their residences. ALANIS arrives at 4242 Willow Way at approximately 1110 hours. ALANIS stays in his vehicle till approximately 1121 hours when he exits the Altima and goes into the residence of 4242 Willow Way Milwaukee, WI (**Target Location 1**) (pictured below left). At approximately 1120 hours, SILVA-ALVAREZ is observed arriving at his residence of 4331 S 76th St Greenfield, WI, (**Target Location 2**) and going inside his residence (pictured below right).




77. During the deal the CI messaged SILVA-ALVAREZ that they arrived at the area SILVA-ALVAREZ provided, and SILVA-ALVAREZ told the CI that he was on his way and then that he was 10-12 minutes out. The CI provided their exact address and SILVA-ALVAREZ told the CI that he was pulling up (pictured below).

46



78.     The CI stated that while they were waiting for SILVA-ALVAREZ to arrive at the agreed upon location, a black Ford Explore pulled up to next their vehicle. The CI stated that SILVA-ALVAREZ was inside of the Ford Explorer and told the CI to follow him. The CI followed him to and explained that SILVA-ALVAREZ pulled up to where ALANIS's vehicle, a black Nissan Altima, was parked. The CI stated that they could not see who was in the Altima but explained that they know it was ALANIS's vehicle based on previous interactions with ALANIS and that Altima. The CI stated they observed SILVA-ALVAREZ go up to Altima and the individual in the driver seat of the Altima handed SILVA-ALVAREZ a firearm with an extend magazine. The CI explained this is the same firearm that they purchased with the extended magazine. The CI described the driver of Altima to be in black hoodie.

79.     The CI explained that after SILVA-ALVAREZ interacted with the Altima the CI stated that SILVA-ALVAREZ waved for the CI to enter SILVA-ALVAREZ's vehicle. The CI explained that SILVA-ALVAREZ gave him the two firearms that were purchased, and SILVA-ALVAREZ told the CI that he did not want to give up the 17C, referring to the firearm he got from the Altima, because it is rare. The CI also explained the 17C was SILVA-ALVAREZ's personal firearm.

47

80.     The CI was shown the below photo of SILVA-ALVAREZ which was taken not long after the deal when SILVA-ALVAREZ got back to his residence of 4331 S 76th St, Greenfield, WI (**Target Location 2**). The CI confirmed that this was the individual who sold them two firearms affixed with MCDs.



81.     Review of audio and video recording shows a black Explorer pulls up next to the CI's vehicle and an individual tells the CI to follow him down the block. The CI can be heard giving out the license plate of AYZ4967 of the vehicle they are following. This is the same plate AYZ4967 for the Ford Explore that surveillance observed the day of the deal and that SILVA-ALVAREZ drove to a previous controlled buy where he sold the CI a firearm and MCD. Once parked, the video shows the CI getting out of their vehicle and getting into a black Ford Explore with that same license plate (pictured below).



82.     Once the CI is in the Explorer the video shows SILVA-ALVAREZ sitting in the driver's seat of the Explorer. As he is handing the firearms to the CI, SILVA-ALVAREZ says, "I just had…had my cousin put these motherfuckers on that shit. Thats them right there." Based on training and experience it is understood that "motherfuckers" is referring to the MCD and "shit" is referring to the firearm. Based off of this statement; surveillance, prior to the deal, observing SILVA-ALVAREZ conduct a hand-to-hand deal of a small item; surveillance later observing SILVA-ALVAREZ hand the firearm with the extended magazine and a separate smaller item to ALANIS who is sitting in the Altima; the CI stating in the debrief that they observed the individual in the Altima hand the firearm with the extended magazine to SILVA-ALVAREZ; and the CI previously stated that they believe SILVA-ALVAREZ and ALANIS are cousins, it is believed that ALANIS installed the MCD on the firearm SILVA-ALVAREZ handed him. It is also believed that the smaller item SILVA-ALVAREZ handed to ALANIS was the MCD to be installed. Pictured below left is SILVA-ALVAREZ in the driver seat of the Explorer and pictured below right is SILVA-ALVAREZ handing a firearm to the CI.

 

83.     SILVA-ALVAREZ can also be heard telling the CI that one of the firearms has a skull on the invisible button. He goes on to state "That C bro that motherfucker rare bro. I didn't even wanna get rid of it." SILVA-ALVAREZ also tells the CI that his guy got a 22C but that he

wanted more money for it. Based off of training and experience a 22C is referring to a Glock 22C. Also, during the video, the CI can be seen handing the money to SILVA-ALVAREZ. A black Nissan Altima with a plate of AVH1119 parked in front of SILVA-ALVAREZ's Explorer is also captured on video while the CI is in the Explorer (pictured below). This is the same vehicle that both surveillance and the CI observed SILVA-ALVAREZ interacting with.



84.     The firearms purchased are a Glock Inc. Model: 17C; Caliber: 9; Type: pistol; S/N: AHPL948 with a MCD for $1,500 and a Glock GMBH Model: 23; Caliber: 40; Type: Pistol; S/N: BXAK479 with a MCD for $1,500 (pictured below). The total cost was $3,000.



**Surveillance of 4331 S 76th St Greenfield WI (Target Location 2) on April 8, 2025**

85.　　On April 8, 2025, ATF conducted surveillance of 4331 S 76th St Greenfield WI (**Target Location 2**), the residence of SILVA-ALVAREZ. At approximately 1639 hours, a BMW car bearing WI license plate AZG-6283 pulls into the driveway and SILVA-ALVAREZ comes out of his residence and gets into the front passenger seat of the BMW. WI license plate AZG-6283 comes back registered to a Lumpoon Phetvisay (DOB: 12/13/2000) at 2750 S 71st St, Milwaukee, WI.　While in the BMW, SILVA-ALVAREZ is observed being handed a box and opening it (pictured below).



86.　　At approximately 1640 hours, SILVA-ALVAREZ pulls a black object that looks consistent with a firearm from the box and handles it (pictured below left). After putting the suspected firearm back inside the box, SILVA-ALVAREZ is observed leaving the BMW with the box in his hand and going inside the residence at approximately 1648 hours (pictured below right). Based off of training and experience this interaction is consistent with dealing a firearm. This also occurred while SILVA-ALVAREZ was organizing a deal with the CI for multiple firearms and less than two hours after this hand-to-hand occurred SILVA-ALVAREZ sent a photo to the CI of 2 firearms he said he would sell to the CI. This is documented further in the below paragraphs covering the third CI buy from Alexander SILVA-ALVAREZ on April 10, 2025.

51

 

**Third CI Buy from Alexander SILVA-ALVAREZ April 10, 2025**

87.     On April 1, 2025, ALANIS messaged the CI saying he had a Glock 23 with a button for $1,350 and sent a photo of the Glock 23 (pictured below left). ALANIS also posted for sale on Telegram a photo of an AR pistol and a black and tan handgun (pictured below middle). On April 2, 2025, the CI asked ALANIS how much for the AR pistol. ALANIS told the CI it is $1,500 and that it is binary (pictured below right). Based off of training and experience I know that binary refers to a modification that is done to the firing systems of the firearm that allows the firearm to expel one round when the trigger is pulled and an additional round when the trigger is released.

  

88.     On April 7, 2025, the CI observed a Telegram post by SILVA-ALVAREZ regarding three firearms and reached out to SILVA-ALVAREZ asking how much for all three of the firearms. SILVA-ALVAREZ tells the CI that the price is firm but two of the firearms are binary. On April 8, 2025, the CI let SILVA-ALVAREZ know they would buy all 3 firearms. SILVA-ALVAREZ explained that one of the three firearms is pending sale to another individual because that individual is willing to buy it for $1,750. The CI tells SILVA-ALVAREZ they will swing through on Thursday to buy the firearms. Later that day SILVA-ALVAREZ told the CI the other individual fell through, and that SILVA-ALVAREZ would be selling the CI all three firearms. SILVA-ALVAREZ also tells the CI that he is on his way to his storage unit to pick up the firearms (pictured below left). SILVA-ALVAREZ sends the CI a photo of two of the firearms he is selling to the CI (pictured below right). The CI asks SILVA-ALVAREZ if he has any firearm boxes for the firearms being purchased and SILVA-ALVAREZ lets the CI know that he does for the Glock, and he would have to check his brother's house for the FN. Also pictured below right.

 

89.     On April 9, 2025, SILVA-ALVAREZ lets the CI know that he has a box for all of the firearms and that he did have the gun box for the FN. He also lets the CI know that he will ask his cousin if he has the bag for the AR pistol. Based off of SILVA-ALARVEZ and ALANIS being cousins, ALANIS posting on Aril 1, 2025 a photo in Telegram of an AR pistol and FN pistol, these two firearms looking the same when comparing ALANIS photo and SILVA-ALARVEZ photo, and ALANIS and SILVA-ALVAREZ working together in the past to sell firearms and MCDs it is believed that the AR pistol and the FN pistol are the same firearms and ALANIS and SILVA-ALVAREZ are working together in the sale of these firearms.

90.     On April 10, 2025, at approximately 1120 hours the CI E/S was activated and at approximately 1124 hours the CI departed the pre-designated location en route to the deal location of 1900 S 37th ST Milwaukee, WI 53214. At approximately 1128 hours the CI arrived at the deal location. During this drive the CI was under constant surveillance by ATF and WPD. While at the deal location ATF, and WPD maintained surveillance of the CI during the deal.

91.     While the CI was en route to the deal location SILVA-ALVAREZ sent the CI a photo of a FN pistol in a gun box, a Glock gun box, a Glock pistol and an AR pistol, all in a cardboard box (pictured below). The CI let SILVA-ALVAREZ know their location, which is where the deal occurred and the same spot the CI met SILVA-ALVAREZ on the previous deal. SILVA-ALVAREZ told the CI he arrived at the deal location.

54



92.     At approximately 1139 hours surveillance units observed SILVA-ALVAREZ leave his residence (**Target Location 2**) with a brown cardboard box and go to a black Ford Explorer AYZ4967 (pictured below). This is the same Explorer SILVA-ALVAREZ has used in past deals. At approximately 1142 hours SILVA-ALVAREZ departed in the Explorer and headed to the deal location. At approximately 1153 hours SILVA-ALVAREZ arrived at the target location. He was under constant surveillance during his drive and made no stops in between his residence (**Target Location 2**) and the target location.



93.     At approximately 1155 hours the deal concluded, and SILVA-ALVAREZ departed the area. Both the CI and SILVA-ALVAREZ were under constant surveillance during the deal. After the deal concluded and SILVA-ALVAREZ departed the area it was learned that SILVA-ALVAREZ sold the CI items not agreed upon, instead of three firearms they previously agreed upon. The items purchased are a Glock gun box for a G23 S/N BSYL256, a Ruger gun box for a Ruger 57 S/N 641-83358, 3 water bottles, a blue blanket, softball size rock, a $CO_2$ powered BB Gun and a cardboard box (pictured below). These items were purchased for $4,800.



94.     After the deal concluded the CI was debriefed by ATF and WPD. ATF searched the CI's phone to include phone calls, text messages and the Telegram app and found no indication in anyway the CI was aware of the deception by SILVA-ALVAREZ in the sale of false goods. When going back into Telegram SILVA-ALVAREZ blocked the CI from the main account he communicated with the CI (account name Chuky) and SILVA-ALVAREZ's channel (channel name TheMenu) he is advertising the firearms and MCDs. SILVA-ALVAREZ did not block the CI from

56

his other Telegram account Dra Ko and the CI was able to send SILVA-ALVAREZ a message regarding the sale. SILVA-ALVAREZ then blocked the CI from that account (pictured below).



95.     During the debrief of the CI the CI explained that the black Ford Explorer pulled up to their vehicle and this was the same Explorer SILVA-ALVAREZ used in the previous two deals. The CI also explained that it was SILVA-ALVAREZ who they met and is the same person from the past two deals. The CI stated they talked about sunglasses and the CI asked SILVA-ALVAREZ if he had any switches. SILVA-ALVAREZ told the CI he would have to ask his cousin because the CI bought all the switches SILVA-ALVAREZ had.

96.     The CI also explained that SILVA-ALVAREZ was armed with a Glock handgun with an extended magazine and what they believed was a holosun sight. The CI explained that this firearm was wedged in between the driver seat and center console. Through training and experience I know that individuals illegally dealing in firearms also will carry a firearm for their protection and that the location described by the CI is a common spot for these individuals to have their firearms.

97.     The CI explained that they paid SILVA-ALVAREZ and then grabbed the cardboard box from the trunk of SILVA-ALVAREZ vehicle. The CI went back to their vehicle and SILVA-

ALVAREZ left. The CI checked the box and found inside two empty gun boxes, a bb gun, some water bottles, a rock and a blanket.

98.     Review of audio confirms that the CI and SILVA-ALVAREZ talked about if SILVA-ALVAREZ had any more switches and SILVA-ALVAREZ explaining he would have to ask his cousin because SILVA-ALVAREZ sold all of his. SILVA-ALVAREZ also goes on to say that the switches his cousin has are gold, and he is not sure if his cousin would want to sell those. Review of the video shows the black Explorer and the license plate of AYZ4967 (pictured below) which is the same vehicle SILVA-ALVAREZ has used in pervious deals.



99.     The video also confirms it is SILVA-ALVAREZ that the CI is interacting with and shows SILVA-ALVAREZ handling the money the CI gave him. When SILVA-ALVAREZ is handling the money, you can see his hand tattoo (pictured below left). When going on the Facebook profile for SILVA-ALVAREZ he posted on April 7, 2025, a photo of himself where you can see his hand tattoo (below right). When comparing the two photos you can see that they are the same tattoo.

 

SILVA-ALVAREZ hand tattoo from deal          SILVA-ALVAREZ hand tattoo from Facebook

**Identification of SILVA-ALVAREZ's New Phone Number**

100.    On April 18, 2025, the Honorable Judge Duffin an extension to the location data warrant for SILVA-ALVAREZ's phone number of 414-870-3317 (TARGET TELEPHONE 2). On April 21, 2025, ATF was monitoring the associated pings and saw that the ping was returning with "no location returned for target". The last location provided was from April 18, 2025.  ATF contacted Verizon Wireless regarding the lack of location returns. Due to the language in the warrant Verizon Wireless was able to provide ATF with information that SILVA-ALVAREZ switched his phone to a new phone number of 262-666-2846 (TARGET TELEPHONE 3). Based off my training and experience I know that individuals who illegally deal firearms, machineguns and MCDs, will commonly switch their phones to help avoid detection and monitoring by law enforcement.

**Review of Irving ALANIS's iCloud**

101.    On March 21, 2025, the Honorable Judge Duffin granted a search warrant for Irving ALANIS's iCloud accounts of alanisirving2003@icloud.com and rexman001@icloud.com. As part of the return Apple provided account information for the iCloud accounts that the warrant was served on. The account information showed that these accounts have an address of 4242 W Willow Way, Milwaukee WI (**Target Location** 1) and a phone number of 414-731-4340 (TARGET TELEPHONE 1). This address and phone number have been previously established as the address

59

and phone number for ALANIS. The information also showed a phone number of 224-474-7345 belonging to Irving ALANIS. In addition to the two iCloud accounts the warrant was served on Apple provided 5 additional iCloud accounts, which are as follows: shabby.god@icloud.com, balmainparis10@icloud.com, irvingalanis003@icloud.com, irvingalanis123@icloud.com, and irvingalanis03@icloud.com. The shabby.god@icloud.com and balmainparis10@icloud.com accounts have the same address (**Target Location 1**) and phone number (TARGET telePHONE 1) as ALANIS. The other 3 accounts below have not only the same address (**Target Location 1**) and phone number (TARGET PHONE 1) but also list Irving ALANIS as the name on the account.

102.     Included in the information provided by Apple are notes. Included in these notes is a note of a list of items. With this list it has the price paid for, the price sold for and the profit for each item (pictured below left). The list includes words like "cookies" and "carts" and based off my training and experience I know these are slang for controlled substances. I also know based off my training and experience that individuals who illegally deal in firearms and controlled substances will keep a ledger of money spent and money made off the firearms and controlled substances they have bought and sold. There is also a second note of a list of items similar to the first note (pictured below right).



104.    Also included in the information provided by Apple was photos and contact information for different individuals. Some of the photos found on the iCloud include multiple different firearms. The below left photo is multiple firearms on a bed. The metadata of this photo shows that the provider date is 4/3/23 and the location is 4242 W Willow Way Milwaukee, WI (**Target Location 1**). The below middle photo is of multiple firearms and firearm cases in the trunk of a vehicle. One of the pistols in the photo appears to have an MCD attached to it. The metadata of this photo has a provider date of 4/18/23. The below right photo is of a wide variety of firearms displayed on a wall. The metadata of this photo has a provider date of 6/6/24. Based off my training and experience these photos with the volume and types of firearms are consistent with firearms that are trafficked both in United States and Mexico.

  

105.     The below left photo shows a pistol with an MCD attached in the cup holder in the center console of a vehicle. Also in the photo is a large plastic bag of marijuana. The metadata of this photo has a provider date of 6/12/24. The below middle photo shows a pistol wedged between the driver seat and center console of a vehicle with marijuana packaged in a plastic bag on the center console and US currency located in the center console cup holder. The metadata of this photo has a provider date of 9/9/24. The below right photo is of multipole vacuum sealed bags of marijuana with three pistols on top of the marijuana. The metadata of this photo has a provider date of 9/14/24. Based off my training and experience these photos display actions that are consistent with an individual who sells controlled substances and uses firearms for their protection while selling the controlled substances.

  

62

106.     The below left photo is of white pills with the caption "Hit me while they here". The metadata of this photo has a subscriber date of 9/9/23. Based off my training and experience "Hit me while they here" in the photo is an advertisement of the controlled substances for sale and is telling the buyers to reach out to buy them before they are gone. The below middle photo and below right photo are photos of white pills packaged in a plastic baggie. The metadata for the below middle photo has a provider date of 11/10/23 and the below right has a provider date of 11/14/23. Based off my training and experience these photos display actions that are consistent with an individual who sells controlled substances.

  

107.     Also on the iCloud are photos of screenshots of different text messages. The below left photo is a screenshot of text message with "Jefe". Jefe sent a message of "mira lo que tienen de evidencia," which translated through Google translate comes to "look at what evidence they have". Following that message Jefe sent a picture with firearm casings in a zip lock bag. The metadata of this photo has a provider date of 11/13/23. The below right photo is a screenshot of text messages with "Pops". The contact number for Pops provided in the Apple return has a phone number of 414-687-4483. A law enforcement database check shows that this number belongs to Armando Alanis SR, who is Irving ALANIS father. Irving ALANIS sent "Deje 2K abajo de la caja de dish en tu cuarto ya cuando acade con estos movimientos te doy mas," which translated through Google translate comes to "I left 2K under the dish box in your room, and when I finish these moves I'll give you more".   The metadata of this photo has a provider date of 9/19/24. Based off training and experience "moves" is frequently used as slang for selling illegal substances.




108. The below left photo is of a screenshot of a group message with 6 people. "Peter Pan" sent messages of "The spot hot Unc said"; "And they asking bout Irv," and "Feds". The metadata has a provider date of 7/1/24. Based off of my training and experience the term "spot hot" typically means that there is a law enforcement presence in an area, or the area is being looked into by law enforcement. It is understood that "Irv" is referring to Irving ALANIS, "Feds" is referring to federal law enforcement, and that "they" is federal law enforcement asking about ALANIS. The below right photo is a screenshot of text massages involving a "Dell2.0" and a "Peter Pan". Dell2.0 sends a message of "I think I just lost a load," and ALANIS replying with "From the mail?". Dell2.0 has a contact number of 559-892-9719 saved in the iCloud. A law enforcement database check shows that this number belongs to a Dellan M Sikhathakhosa, with a DOB of 7/1/2001 and an address of 6671 N Delbert Ave Fresno CA 93722. The metadata for this photo has a provider date of 9/19/24. Based off my training and experience "load" is referencing a package of illegal substances. It is also common for illegal substances to be shipped through the mail and for these packages to get lost, stolen or interdicted.

 

65

109.    Also in the iCloud photos are two screenshots of two different Telegram pages. The below left photo is the Telegram page titled "WE UP LA PRIVATE MENU". Visible in the photo is marijuana in the context of buying it in bulk. The photo also shows this page is the "Back Up Page" and "DM @WeUpLA To Order". Based off my training and experience "DM @WeUpLA To Order" is referring to sending a direct message to another account (@WeUpLA) to order the marijuana. The metadata for this photo has a provider date of 6/13/24. The below middle photo is the Telegram page titled "TopDollarInc". Visible in the photo is the advertisement of marijuana products. The metadata for this photo has a provider date of 6/13/24. The below right photo is of SILVA-ALVAREZ and ALANIS posing with firearms in front of vehicles. The metadata for this photo has a provider date of 11/12/23 and has a location 4331 S 76th St Greenfield, WI (**Target Location 2**). This address has been previously established as SILVA-ALVAREZ current residence.

  

110.     All of the above-mentioned photos found on ALANIS's iCloud have a date range based off the metadata from April of 2023 to September of 2024. Based off what is in the photos and my training and experience, these photos display actions and communications that are consistent with individuals who are engaged in illegal activities to include the selling of controlled substances and the illegal selling and trafficking of firearms.

**Surveillance of 4331 S 76th St Greenfield WI (Target Location 2) on April 30, 2025**

111.     On April 30, 2025, ATF conducted surveillance of 4331 S 76th St Greenfield, WI (**Target Location 2**) the residence of SILVA-ALVAREZ. At approximately 1435 hours ATF observed a white 4-door SUV pull into the driveway of 4331 S 76th St. At approximately 1438 hours, a male leaves the residence (**Target Location 2**) through the front door and approaches the front passenger window of the white SUV. This individual pulled a baseball-sized, darker in color object out of his hoodie pocket and put that item inside the white SUV through the passenger side window. This is pictured below and the red arrow points to the item this individual took out of his hoodie pocket.



112.     While the individual from the residence was reaching into the white SUV, the driver of the white SUV reaches over to their right with their left hand. Then the individual, from the residence (**Target Location 2**), removes their arm from the vehicle, no longer holding the original

item he had and is now holding an item that is consistent with cash. The driver of the white SUV is then observed holding the same object the individual from the residence put into the SUV. This is pictured below, and the red arrow points object the driver received from the other individual. Based off training and experience this interaction is consistent with a hand-to-hand deal for controlled substances.



**Debrief of CI May 13, 2025**

113.     On May 13, 2025, ATF and WPD debriefed the CI. The CI explained that ALANIS is still actively selling marijuana on his Telegram page "MilhouseMenu". The CI explained that on April 18, 2025, ALANIS posted on his telegram page, "…I can't do my prices on QPs that I posted that's my peoples products." Based on training and experience I know that "QPs" is short for quarter pound, and QP is commonly used when discussing drug weights. I also know that "Product" is slang for controlled substances. This sentence ALANIS posted is understood that he cannot sell the QPs at the price he normally offers because he is selling his associates' ("peoples") controlled substances. Then on April 21, 2025, ALANIS posted on his Telegram page prices for different amounts of marijuana. Both of these posts are pictured below.

68



114.    The CI further stated that on April 30, 2025, ALANIS was posting pictures of marijuana on his Telegram page (pictured below left) and posting, on the same day, on his Instagram account (milhouse448) an advertisement of marijuana prices (pictured below right). This photo shows words like "QP" "HP" followed by numbers and words like "cookies". Based off of my training and experience in know that "QP" and "HP" are weights of controlled substances and when followed by a number that number is representing the price that weight is being sold for. I also know that words like "cookies" are used as slang for controlled substances. I also know that individuals who advertise the sale of controlled substances on apps like Instagram will use slang and abbreviations to mask the fact they are advertising controlled substances for sale because if it were obvious in the posting of what they are selling there is a chance Instagram will remove the post and/or block their account.

69

 

115.    The CI also stated that ALANIS posted on May 8, 2025, a photo of a large quantity of marijuana and then on May 12, 2025, posted "Will have 800$ mid in a little bit" (pictured below). It should be noted that this post also included a plug emoji at the end of the sentence. Based off my training and experience, "mid" is slang for a type of marijuana and the plug emoji is to represent the word "plug" which is slang for an individual who supplies someone with controlled substances. The CI also explained that ALANIS posted on his Instagram story a picture of a car dashboard that the CI believed was the same car dashboard as SILVA-ALVAREZ's Explorer. The CI attempted to show ATF and WPD the photo however the photo was no longer on ALANIS's Instagram story. Based on training and experience I know that Instagram has a feature that allows photos to disappear after a certain time when posted as a story.

70



**Review of Surveillance Video at 4331 S 76ᵗʰ St Greenfield, WI**

116.     On June 10, 2025, ATF reviewed surveillance video of 4331 S 76th St Greenfield, WI, the residence of Alexander SILVA-ALVAREZ. A review of the video surveillance showed on March 18, 2025, at approximately 1359 hours a dark green Chevy Avalanche with a WI plate UP2824 pull into the driveway of 4331 S 76th St.  This WI plate comes back registered to Jennifer Arroyo-Cotton. At approximately 1406 hours SILVA-ALVAREZ leaves the residence with his hands in his pocket and approached the driver's side door of the Avalanche (picture below left). Immediately when SILVA-ALVAREZ gets to the Avalanche he reaches into the vehicle through the driver's side window (pictured below right). When SILVA-ALVAREZ is reaching into the vehicle he places a smaller sized item into the vehicle. The driver of the vehicle then hands a smaller sized item to SILVA-ALVAREZ. Then, at approximately 1406 hours, the vehicle departs the residence and SILVA-ALVAREZ goes back into the house.





117.    A review of the video surveillance showed on March 25, 2025, at approximately 1709 hours, a dark green Chevy Avalanche pull into the driveway of 4331 S 76th St. Video surveillance was unable to capture the license plate of the vehicle however the make, model and color all match the vehicle observed on March 18, 2025, and June 10, 2025. At approximately 1711 hours SILVA-ALVAREZ leaves the residence with his left hand in his pocket and approached the driver's side door of the Avalanche (pictured below left). Immediately when SILVA-ALVAREZ gets to the Avalanche he reaches into the vehicle through the driver's side window and hands the driver a smaller sized item (pictured below right). After, he grabs a smaller sized item from the driver of the vehicle and at approximately 1711 hours SILVA-ALVAREZ enters his residence. The Avalanche also departs at approximately 1711 hours.

 

118.    A review of video surveillance showed on June 10, 2025, at approximately 1235 hours a dark green Chevy Avalanche with a WI plate UP2824 pull into the driveway of 4331 S 76th St. At approximately 1238 hours an individual was observed at the driver's side door of the Avalanche and was observed reaching into the vehicle through the driver's side window. This is pictured below left with the red arrow pointing at the individual's arm reaching into the vehicle. This individual was identified as Alexander SILVA-ALVAREZ when at approximately 1238 hours this individual enters the residence (pictured below right). Also, at approximately 1238 hours the Avalanche leaves the residence. Based on my training and experience this interaction along with the 2 other interactions mentioned above between SILVA-ALVAREZ and the Avalanche are consistent with SILVA-ALVAREZ selling controlled substances to the driver of the Avalanche in a hand-to-hand deal.

 

**CI Debrief June 12, 2025**

119.    On June 12, 2025, ATF and WPD debriefed the CI. The CI explained that ALANIS is still actively selling marijuana through his telegram page "MilhouseMenu". The CI explained that ALANIS was posting pictures of marijuana with weight and prices for it. The CI explained that the

pink bowtie emoji in the list of weights represents a pound of marijuana. The posts of marijuana for sale were posted on May 29, June 4, June 6, June 7 and June 12.

120.    The CI also explained that on May 26, 2025, ALANIS posted on his Instagram story a large quantity of firearms with song lyrics in the photo (pictured below left). The CI also stated that on May 31, 2025, ALANIS posted on his Instagram story a photo of a tan Glock pistol (pictured below right). The tan Glock and the majority of the firearms, in the below left photo, are consistent with the firearms that ALANIS sold to the CI. Based on my training and experience the amount and type of firearms, in the below left photo, are consistent with firearms that would be trafficked.

 

**Vehicles, Basements and Outbuildings**

121.  I know. based upon my training and experience, that firearms, MCDs  and evidence of illegal firearms dealing and firearms trafficking can be secreted in any part of a residence

including garages, associated storage areas, vehicles on and associated with the premises, and on persons engaged in illegal firearms dealing and firearms trafficking within the residence. I also know, through personal training and experience in investigating illegal firearms dealing and firearms trafficking, that firearms and MCDs are frequently stored with proceeds and ammo at illegal firearms dealers and firearms traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged illegal firearms dealing and firearms trafficking would conceal evidence related to illegal firearms dealing and firearms trafficking in multiple areas associated with their residence including vehicles, garages and basements.

## Computers, Electronic Storage and Forensic Analysis

122.  As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Target Premises** and **Target Vehicles**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

123.  *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **Target Premises** or **Target Vehicles**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

124. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Premises** and **Target Vehicles** because:

e.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of

76

information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example,

77

information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.      I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

125. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires

78

the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

k.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

l.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

m.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

126. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant

79

and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

127. I know from my training and experience, as well as publicly available materials, that encryption systems for mobile phones and other electronic devices are becoming ever more widespread. Such encryption systems protect the contents of these devices from unauthorized access by users and render these contents unreadable to anyone who does not have the device's password. As device encryption becomes more commonplace, the encryption systems implemented by device manufacturers are becoming more robust, with few—if any—workarounds available to law enforcement investigators.

1) I also know that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint 19 scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize. Therefore, I request that this warrant permit law enforcement agents to obtain from MARTIN the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that MARTIN's physical biometric characteristics will unlock the device(s).

2) If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

3) If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the frontfacing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

4) If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

5) In my training and experience, users of electronic devices often enable the

81

aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

6)     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices are subject to search and seizure pursuant to the applied-for warrant. The passcode or password that would unlock such device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

7)     I know, from my training and experience, that criminals will frequently maintain multiple cellular devices at one time, in order to compartmentalize information and access to the same. I also know SILVA-ALVAREZ, as previously described, has used multiple cellular devices during this investigation. I therefore believe it likely that SILVA-ALVAREZ has access to multiple cellular devices.

8)     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6

82

days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to obtain from ALANIS and SILVA-ALRVAREZ the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. This procedure is of especial importance here, given ALANIS and SILVA-ALRVAREZ criminal history and potential familiarity with these limitations.